**Thomas D. KAVENEY, Plaintiff,**

v.

**Harold MURPHY Defendant.**

**No. 99–11138–NG.**

United States District Court, D. Massachusetts.

Feb. 18, 2000.

Vida K. Berkowitz, McDonald & Associates, West Newton, MA, for Thomas D. Kaveney, Plaintiff.

Nicholas Foundas, Eisenstadt & Foundas, Boston, MA, Arthur J. Goldberg, City Hall, Law Dept., Cambridge, MA, for Harold Murphy and City of Cambridge, Defendants.

### *MEMORANDUM AND ORDER*

GERTNER, District Judge.

This case involves the application of Rule 4.2 of the Massachusetts Rules of Professional Conduct to prohibit court authorized interviews conducted by Plaintiff's counsel of members of the Cambridge Police Department, outside the presence of its counsel. Plaintiff, Thomas D. Kaveney ("Kaveney") is a Sergeant in the Cam-

bridge Police Department ("Department"). He is suing Harold Murphy ("Murphy"), former Deputy Superintendent of the Department and now Superintendent, claiming that Murphy interfered with Kaveney's career advancement because Kaveney participated in an official corruption investigation of the Department.

Plaintiff seeks to interview these witnesses *ex parte* for the same reason most plaintiffs in employment cases do. Like any plaintiff, he wants to make certain that there is an evidentiary basis for all the motions, papers, and pleadings he files. Indeed, he is under an ethical obligation not to file any baseless or frivolous papers with the Court. Yet, unlike plaintiffs outside the employment context, all the relevant action takes place in a setting controlled by the employer. While other plaintiffs can conduct an informal investigation to shape their theories—for example, interview the witnesses to the accident, talk to the participants, determine the strategy out of earshot of his opponents—this Plaintiff must stand at the employer's door and seek permission to enter.

Defendant's counsel, as well as counsel for the City of Cambridge, want to deny permission for the same reason most defendants do—employment case or not. First and foremost, they want to make certain that no employees disclose company confidences or privileged communications. But, just as important, like any lawyer, they want to control the flow of information. They can then shape the defense, and fashion a strategy, also out of the earshot of Plaintiff's counsel.

Rule 4.2 is the successor to Disciplinary Rule 7–104(A)(1), which was enacted to strike a balance between the needs of the plaintiff and those of the defendant organization. While it appeared to prohibit *ex parte* communication under certain circumstances, circumstances which would jeopardize corporate counsel's control, it permitted court authorized contact. Defendant argues that the replacement of the old disciplinary rule with Rule 4.2 has sig-

nificantly changed the balance, broadening the scope of protection offered to the corporation or organization and severely limiting the legitimate justifications for judicial authorization of otherwise prohibited *ex parte* contact. Based on that interpretation, defendant urges the Court not to authorize *ex parte* interviews.

I disagree. Rule 4.2 does not curtail the Court's power to authorize *ex parte* interviews. The changes in the ethical rule may very well reflect a concern for protecting the interests of the corporation or organization, but any such concern is amply met by judicial supervision of the *ex parte* interview process.

On December 20, 1999, this Court heard arguments with respect to Plaintiff's counsel's motion for a protective order [docket entry # 4] to conduct *ex parte* interviews with members of the Cambridge Police Superior Officers Association and the Cambridge Police Patrol Officers Association. The motion was **GRANTED** on December 27, 1999 subject to certain conditions [docket entry # 25]. The Court ordered Plaintiff's counsel not to inquire or discuss any communications protected by the attorney client or work product privilege and to inform each interviewee:

a) Counsel is acting only in connection with her representation of the Plaintiff in this matter;

b) While her firm also represents both police associations with other matters, this action does not concern her representation of such associations, and neither association has any interest in the litigation;

c) The interviewee has the right to decline to be interviewed;

d) No adverse action by either association or that association's counsel will result from any person's refusal to be interviewed or for any statements made during such interview; and,

e) The person may request that the interview only take place in the pres-

ence of that person's personal attorney or in the presence of counsel for the City of Cambridge and that request shall be honored.

The following memorandum states the reasons for the Court's decision.

## I. FACTUAL BACKGROUND

Kaveney alleges that in the course of an official corruption investigation, conducted by the state police and the Federal Bureau of Investigation ("FBI"), it was revealed that Murphy played a role in the installation of illegal gaming devices at the Huron Avenue Veteran of Foreign Wars Post in Cambridge, and that Murphy shared the profits with an individual known by the FBI to be associated with organized crime figures.

The complaint claims that Murphy's actions *vis a vis* Kaveney violated Kaveney's right to freedom of speech (count I), his right to due process and equal protection of the laws (count II), and his rights under the Massachusetts Civil Rights Act (count III). Furthermore, Kaveney alleges that Murphy's conduct constituted intentional interference with an employment relationship (count IV) and intentional infliction of emotional distress (count V).[1]

## II. LEGAL ANALYSIS

### A. Massachusetts Rules of Professional Conduct, Rule 4.2

The parties dispute whether this Court has the authority to grant the protective order in light of Rule 4.2 of the Massachusetts Rules of Professional Conduct and Comment [4] thereto. Rule 4.2 provides:

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Its predecessor, DR 7–104(A)(1) was essentially identical to Rule 4.2.[2] What is not identical is the comment to the Rule which became effective with its adoption by the Supreme Judicial Court on January 1, 1998.

Comment [4] to Rule 4.2 states:

In the case of an organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having managerial responsibility on behalf of the organization with regard to the subject of the representation, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. . . .

Comment [4] had no predecessor. It not only prohibits *ex parte* contact with persons having managerial responsibility, and those persons whose acts and omissions could be imputed to the organization for liability purposes, but also *ex parte* contact with any person whose statements may constitute an admission on the part of the organization.

The latter category covers employees who are clearly outside the corporation's

---

1. The complaint also contained a sixth claim against the City of Cambridge. However, that claim was dismissed without prejudice on November 2, 1999. While the City of Cambridge is no longer a formal party to this lawsuit, the ethical rule at issue which governs a lawyer's contact with persons represented by another lawyer is still applicable. The fact that the City of Cambridge is no longer a party to the lawsuit has no bearing on the outcome of this decision.

2. DR 7–104(A)(1) provided:

(A) During the course of his representation of a client, a lawyer shall not:
(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized to do so.

or organizations's "control group" (defined as those employees who are authorized to seek and act upon legal advice for the corporation). Indeed, reported decisions in this district interpreting Rule 4.2 define the reach of Comment [4] broadly. In one, authored by Chief Judge Young, the Court is quite critical, describing the rule as "strikingly protective of corporations," that it is "measured not by reference to the attorney-client privilege at all, but rather by the scope of the evidentiary rule admitting the statements of an employee in an action against the corporate employer." *Pratt v. National Railroad Passenger Corp.*, 54 F.Supp.2d 78, 79, 80 (D.Mass. 1999).[3] However, because Kaveney's counsel is seeking judicial authorization for employee interviews, not *post hoc* justification of them, I do not have to decide whether such a broad interpretation is warranted.[4]

### B. *Applicability of Rule 4.2 to the Motion for a Protective Order*

It is clear that Kaveney's counsel seeks information from employees on matters within their scope of employment. Kaveney's counsel submitted to the Court a list of sample questions illustrative of the type she proposed to ask in the *ex parte* interviews [docket entry # 27]. The answers to these questions not only *could* produce statements concerning matters within the employee's scope of employment, but certain questions definitively would produce such statements. The following question is just one example:

> Have you been ordered by Murphy or anyone under his command to treat Kaveney in a way you would not inde-

pendently have treated him, or have treated a similarly situated officer?

Kaveney's counsel asks this Court to provide the legal authorization to conduct this form of informal discovery. She relies on the closing language of Rule 4.2 which permits the *ex parte* contact if the lawyer is "authorized by law to do so."

Prior to the adoption of Rule 4.2, the courts of this district had consistently employed a balancing test to determine whether to authorize this form of *ex parte* contact with an organization's employees. *See Mompoint v. Lotus Development Corp.*, 110 F.R.D. 414, 418 (D.Mass.1986)(rejecting "the view that the corporation's right to 'effective representation' requires an absolute prohibition in all instances against interviews with corporate employees concerning matters within the scope of the employees' employment [and instead calls for the court] to strike a balance in individual cases which takes account of the competing interests"); *Morrison v. Brandeis University*, 125 F.R.D. 14, 18 (D.Mass.1989)("A plaintiff's need to gather information on an informal basis on the one hand and the defendant's need for effective representation on the other can, in most cases, only be balanced with reference to the facts and circumstances which appertain to the particular case at hand"); *Siguel v. Trustees of Tufts College*, No. CIV.A.88-0626-Y, 1990 WL 29199, at *3 (D.Mass. March 12, 1990)("a determination of whether [plaintiff] may have access to current ... employees is best made not by reference to some universal test, but by balancing [plaintiff's] need to speak with them against [defendant's] desire to pre-

---

3. Judge Collings has also interpreted Comment [4] as incorporating the relevant evidentiary rules to define its reach. *Hurley*, 1999 WL 95723, at *2 ("The breadth of the [relevant evidentiary rules] together with the use of the word 'may' in Comment [4] makes it highly likely that any questioning of an opposing corporate party's current employees on an issue likely to be raised in the lawsuit would be prohibited").

4. Some courts, apparently dissatisfied with Comment [4]'s restrictions on access to witness information, have wholly disclaimed the applicability of the Comment altogether. *See, e.g., Niesig v. Team I*, 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030, 1036 n. 6 (1990); *Dent v. Kaufman*, 185 W.Va. 171, 406 S.E.2d 68, 71 (1991)("it is worth noting that the comment to the Rule is not part of the Rule and cannot be considered 'binding' on us or any other court").

vent such access to ensure its effective representation"). *See also Stanford v. President, and Fellows of Harvard University and Francis D. Riley,* 97–BEM–4262 (Order of Investigating Commissioner, December 17, 1999)(Commission implies that employee has the power to authorize *ex parte* interviews).

In both *Siguel* and *Morrison,* the courts recognized that the ethical rule (at least as interpreted by the Massachusetts Bar Association) prohibited contact which could produce statements admissible against the corporation—those statements made by employees concerning matters within the scope of their employment—and not just contact with high-level or managerial employees. But they also acted pursuant to the rule's exception which permitted the *ex parte* contact when "authorized to do so." *Siguel,* 1990 WL 29199, at *2 (plaintiff "can only interview current employees *ex parte* if this Court applies the 'unless . . . authorized to do so' exception by issuing an order compelling access to potential employee-witnesses"); *Morrison,* 125 F.R.D. at 18 n. 1 ("I am dealing with the more limited question of when the Court should apply the exception to the rule ('unless authorized to do so') and authorize an attorney to interview employees of a defendant-corporation whose statements may be admissible against the corporation pursuant to Rule 801(d)(2)(D), F.R. Evid.").

Murphy argues that even this avenue—judicial supervision of the *ex parte* interviews—is now barred.

### 1. *"Person" Versus "Party"*

He claims that the cases calling for a balancing test are no longer viable because Rule 4.2 bars contact with a "person" represented by another lawyer, and not just a represented "party," as did its predeces-

sor. Furthermore, Comment [4] makes explicit that such "persons" include employees whose statements "may constitute an admission on the part of the organization."

While many jurisdictions have wrestled with the question of exactly who was a "party," under the old disciplinary rule,[5] and the courts of this district queried as to whether the Massachusetts Bar Association's broad interpretation of a "party" was appropriate,[6] the issue was simply not material in either *Morrison* or *Siguel,* and is not material here. In both those decisions, as in this case, the courts did not define who the lawyer could contact without permission of that person's (or the organization's) counsel, but whether to provide authorization to permit the *ex parte* contact as an exception to the general prohibition on such contact. Thus, in *Siguel,* the court authorized broad *ex parte* contact with "*any current . . . employees regardless of whether they are in management or non-management positions.*" *Siguel,* 1990 WL 29199, at *3 (emphasis added). By authorizing contact with "any employee," the court certainly included employees considered to be a "party" under the old rule, employees whom counsel was not permitted to approach *ex parte.* The court's order took no account of those distinctions.

Likewise, Murphy's reliance on *Hurley* is simply misplaced. In that case, the court rejected counsel's arguments that his *ex parte* contact was permissible under Rule 4.2. Plaintiff's counsel sought, amongst other things, a description of the employees' job responsibilities—a matter clearly concerning matters within the scope of employment. For this reason, the court characterized as "close to ludicrous," the plaintiff's counsel's argument "that a

---

5. *See* Felicia Ruth Reed, *Ethical Limitations on Investigating Employment discrimination Claims: The Prohibition On Ex Parte Contact With A Defendant's Employees,* 24 U.C. Davis L.Rev. 1243 (1991); *Morrison,* 125 F.R.D. at 16–18.

6. *See Mompoint,* 110 F.R.D. at 417 ("Whether this interpretation of DR 7–104(A)(1) is a correct interpretation, or whether the rule, if correctly interpreted, is appropriate, is open to debate"); *Siguel,* 1990 WL 29199, at *1 n. 1.

statement by Smith, a current employee of the defendant, as to what his job responsibilities and duties were and are could not be deemed an admission of the corporation." *Hurley,* 1999 WL 95723 at *2.

But, unlike the present case, counsel in *Hurley* engaged in the *ex parte* contact without seeking prior legal authorization from the court. Nothing in the decision suggests that the new Rule 4 .2 in any way altered the court's authority to provide *prior* authorization for *ex parte* contact otherwise prohibited. *Id.* at *1 ("Plaintiff's counsel does not deny the contact ... was without ... *the permission of the Court* ")(emphasis added); *Id.* at *2 ("counsel takes a grave risk when he or she contacts a current employee of an organization without knowledge of the organization's counsel or *permission of the Court* ")(emphasis added); *Id.* at *2 ("plaintiff is ORDERED to have no further contact with any current employee of the defendant without the consent of counsel for the defendant or *advance permission of the Court* "). There is no discussion of a balancing test because the court was not deciding whether to authorize *ex parte* contact, but whether to prohibit ongoing, unauthorized *ex parte* contact.

### 2. *Authorized "By Law" To Do So*

Murphy also contends that the addition of the phrase "by law" to the language permitting an exception to the general prohibition on *ex parte* contact (when the lawyer is "authorized to do so" to "authorized by law to do so") deprives the court of the authority to provide legal authorization.[7]

Murphy relies on *Pratt* in arguing that Kaveney's counsel must point to a statute or regulation that specifically authorizes the *ex parte* contact. In *Pratt,* the Court found that an attorney's *ex parte*

deposition of an employee of the National Railroad Passenger Corporation was authorized by section 10 of the Federal Employers' Liability Act which states:

Any contract, rule, regulation, or device whatsoever, the purpose, intent, or effect of which shall be to prevent employees of any common carrier from furnishing voluntarily information to a person in interest as to the facts incident to the injury or death of any employee, shall be void, and whoever, by threat, intimidation, order, rule, contract, regulation, or device whatsoever, shall attempt to prevent any person from furnishing voluntarily such information to a person in interest, or whoever discharges or otherwise disciplines or attempts to discipline any employee for furnishing voluntarily such information to a person in interest, shall, upon conviction thereof, be punished by a fine of not more than $1,000 or imprisoned for not more than one year, or by both such fine and imprisonment, for each offense: *Provided,* That nothing herein contained shall be construed to void any contract, rule, or regulation with respect to any information contained in the files of the carrier, or other privileged or confidential reports.

45 U.S.C. § 60.

The railroad had refused to make an employee available for a deposition. The employee had investigated the conditions of a baggage car that had allegedly injured the plaintiff upon his opening its doors. Finding that the purpose behind section 10 was "to equalize the influence of railroads and employees in the conduct of litigation," the Court stated that, "[i]f section 10 is not the type of legal authorization for *ex parte* communications anticipated by Rule 4.2, it is difficult to imagine what is." *Pratt,* 54 F.Supp.2d at 82.

---

7. I note that in *Hurley,* which also interprets Rule 4.2, the court did not identify this change of language as significant at all, and, by implication in its order, assumed that the court's authority to authorize *ex parte* contact

had not been altered. The court explicitly stated that Rule 4.2 was "for all intents and purposes, the same as DR 7–104(A)(1)." *Hurley,* 1999 WL 95723, at *1.

But while *Pratt* stands for the proposition that a statute may authorize *ex parte* contact otherwise prohibited by Rule 4.2, it does not suggest that a statute or regulation is the only legitimate source of legal authorization for otherwise prohibited *ex parte* contact. Indeed, *Pratt* does not even address the question of whether the court can authorize such *ex parte* contact by employing the balancing test used in both *Morrison* and *Siguel.*

This is because *Pratt,* like *Hurley,* came before the court in a strikingly different posture than the present case, *Morrison,* and *Siguel.* In both *Pratt* and *Hurley,* the lawyer engaged in the *ex parte* contact without prior authorization from the court and sought to justify the conduct after the fact. The lawyer in *Hurley* failed because of his unreasonably narrow reading of the prohibition on *ex parte* contact. The lawyer in *Pratt* succeeded by relying on a specific statutory provision aimed at equalizing the employee and railroad in the conduct of litigation.

In the present case, counsel does not seek to justify *ex parte* contact after the fact. On the contrary, she seeks proper legal authorization at the outset so as to avoid committing a potential ethical violation. Nothing in the language of Rule 4.2, Comment [4], or the decisions in *Pratt* and *Hurley* strips the Court of its authority to provide such authorization. Therefore, I analyze the appropriateness of granting such authorization in light of the decisions in *Morrison* and *Siguel.*

## C. *Balancing the Competing Interests*

Employment cases, especially discrimination claims, present the most compelling case for court authorization of *ex parte* contact between the plaintiff's counsel and the defendant's employees.[8] In *Morrison,* the court succinctly explains how barring *ex parte* contact with the defendant's em-

ployees under these circumstances jeopardizes the normal functioning of the adversary process:

> Unless authorization is granted, two important functions which counsel traditionally play in litigation would be precluded. The first is the function of interviewing witnesses without the presence of opposing counsel in order to gain information ... The second is the function of preparing witnesses favorable to a client before testimony at a deposition or at trial without the presence of opposing counsel. In short, without authorization, plaintiff's counsel's ability to prepare her case in the traditional manner is substantially circumscribed.

*Morrison,* 125 F.R.D. at 19. By barring *ex parte* contact with the employee-witnesses, the search for the truth is frustrated and plaintiff's counsel is hindered in preparation for trial.

Moreover, a total ban on *ex parte* communications in employment cases would most likely discourage suits to vindicate certain constitutional and statutory rights, as counsel would face an unusually difficult challenge in satisfying his or her obligation under Federal Rule of Civil Procedure 11 to ensure that the "allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). If virtually all the relevant witnesses are employees of the defendant, plaintiff's counsel is limited to only the formal tools of discovery and cannot conduct informal investigation to ensure the evidentiary support for the claims.

The Second Circuit has eloquently explained the differences between informal interviews and depositions:

---

8. *See* Reid, *supra* note 2 at 1308; David A. Green, *Balancing Ethical Concerns Against Liberal Discovery: The Case of Rule 4.2 and* *the Problem of Loophole Lawyering,* 8 Geo. J. Legal Ethics 283, 307–311 (1995).

In fact, there is little relationship between them. A lawyer talks to a witness to ascertain what, if any, information the witness may have relevant to his theory of the case, and to explore the witness' knowledge, memory and opinion . . .

In contrast to the pre-trial interview with prospective witnesses, a deposition serves an entirely different purpose, which is to perpetuate testimony, to have it available for use or confrontation at the trial, or to have the witness committed to a specific representation of such facts as he might present. A desire to depose formally would arise normally after preliminary interviews might have caused counsel to decide to take a deposition.

*International Business Machines Corp. v. Edelstein,* 526 F.2d 37, 41, n. 4 (2nd Cir. 1975).

Formal discovery has consistently been recognized as an inadequate substitute for the "opportunity to speak directly with potentially favorable witnesses," in large part because "opposing counsel has the right—indeed, the duty—to be present and to influence her client's responses," *Siguel,* 1990 WL 29199, at *3 n. 4. *See also Niesig v. Team I, et. al.,* 76 N.Y.2d 363, 372, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990)("Costly formal depositions that may deter litigants with limited resources, or even somewhat less formal and costly interviews attended by adversary counsel, are no substitute for such off-the-record

private efforts to learn and assemble, rather than perpetuate information"); *Morrison,* 125 F.R.D. at 19 (noting "the tendency which the presence of opposing counsel has to inhibit the free and open discussion which an attorney seeks to achieve at such interviews"); *Siguel,* 1990 WL 29199 at *3 ("For the adversary system to function effectively, counsel must have access to potential witnesses. A lawyer needs access in order to perform the traditional litigation functions of interviewing favorable witnesses and preparing them for trial").

In sum, the interests favoring authorization are promoting the search for the truth, facilitating the lawyer's ability to comply with his or her Rule 11 obligations, and compensating for the unusual lack of information available to the plaintiff through informal discovery—information necessary to effectively prepare for trial. These interests must be weighed against the defendant's interest in effective representation.

However, the interests are not to be weighed in a vacuum, but in the context of the particular facts of the case.[9] In examining the factual allegations of Kaveney's complaint, the balance tilts even more decidedly in favor of authorization of the *ex parte* interviews. Kaveney alleges that he was discriminated against in a variety of ways because of his cooperation with an official corruption investigation of the FBI and the Massachusetts State Police.[10]

9. *Morrison,* 125 F.R.D. at 18 n. 1 ("the Court must analyze the interests and needs on both sides on the basis of the facts and circumstances of the case, not on the basis of some test which is universally applicable to all cases without regard to the particularities of the specific case in which authorization is sought").

10. Kaveney alleges he was treated differently than similarly situated officers with respect to compensation for time spent working with outside law enforcement agencies and being required to produce documentation of his time spent working with those agencies. He also alleges a series of personnel actions were

taken as a form of retaliation for his cooperation with these same agencies. Those decisions include, but are not limited to: taking away his office, the commencement of an investigation by the Internal Affairs Division of the Department, the ordering of a psychiatric evaluation to determine if Kaveney was fit for duty, refusing his request for transfer to a night patrol unit, ordering another officer to investigate an automobile accident in which Kaveney was involved, ordering a detective of the Internal Affairs Division not to speak with Kaveney because he was a "squealer", refusing to promote Kaveney to the position of Supervisor of the drug unit, denying Kaveney's request for computer training, denying

Clearly, the issues are not likely to be resolved through formal documents or data, but rather through witness accounts. This is not a "paper" case.

If Kaveney's counsel obtains admissions for trial on these matters, the Department can easily provide its own version of the events by eliciting statements from the very same employees to counteract any potential distortion or mischaracterization on the part of Kaveney's counsel. *See Morrison*, 125 F.R.D. at 19 (the fact that certain statements may be admissible against the employer "in and of itself, does not mean that [the employer's] counsel has to be present at the interviews of these [employees] in order to ensure 'effective representation' of [the employer]").

The Court's order was the product of a careful, deliberative process. The Court required that Kaveney's counsel submit a set of illustrative questions that she hoped to ask of Department employees. At oral argument, the Court asked Defendant's counsel and counsel for the City of Cambridge to identify all of its concerns with the *ex parte* interview process. The Court's order attempted to eliminate the potential pitfalls they identified. As a result of this process, the Court is confident that the interests of all those involved have been properly balanced to further the administration of justice. Plaintiff's counsel will not willy nilly tread on the corporate attorney client privilege, or misrepresent her status to employees. Defendant's counsel will not willy nilly bar the door to the Department.

As in *Morrison* and *Siguel*, "the needs of the plaintiff and those interests which serve the search for truth and the effective preparation for trial outweigh any need which counsel for [the employer] has to be present at the interviews in order to afford

[the employer] 'effective representation.' " *Morrison*, 125 F.R.D. at 19.

### III.   *CONCLUSION*

For the reasons stated above, this Court **GRANTED** plaintiff's motion for a protective order subject to the conditions set forth therein [docket entry # 25].

**SO ORDERED.**

---

Kaveney's request for reimbursement for damage done to his raincoat during a training exercise, rejecting an investigation report Kaveney wrote involving a racially offensive statement made by Murphy's brother who was an officer under Kaveney's supervision, giving a written warning to Kaveney for excessive use of undocumented sick days in excess of contractually permissible limits despite his not exceeding the limits, and transferring Kaveney to a different platoon to deprive him of days off on holidays.